CONFIDENTIAL
EXECUTION VERSION

June 3, 2021

## MEDIA RIGHTS AGREEMENT

**BETWEEN**

**CARACOL TELEVISIÓN S.A.** with offices in Calle 103 # 69b – 43 Barrio La Floresta. Bogotá/ Colombia. (the '**Licensor**'); and

**INNOVATIVE SPORTS MANAGEMENT, INC. T/A INTEGRATED SPORTS MEDIA,** with offices at 64 N. Summit St, Suite 218, Tenafly, New Jersey 07670, (the '**Licensee**' or '**ISM**').

**WHEREAS**

1. The Licensor holds the exclusive transmission rights for the whole world (excluding Latin America) in and to the soccer matches that the National Senior Team of "**Colombia**"("**Team**") plays as home team during the South American qualifiers of the 2022 FIFA World Cup and one Continental Playoff match (if such match takes place) (hereinafter, the "**Matches**"), and thus, it is fully entitled to license these rights for the Territory of the United States of America.

2. The Licensor desires to engage Licensee to market and distribute the Games (as hereinafter defined) on an exclusive basis for exhibition via CCTV and PPV; and

3. The Licensee is willing to accept such engagement upon the terms and conditions set forth herein,

Now, THEREFORE, the parties hereto do hereby agree as follows:

## TERMS AND CONDITIONS

**1. DEFINITIONS.**

As used in this Agreement, the following terms have the meanings indicated:

(a) "**Games**": means the seven (7) official Matches that the Team plays as home team or home owner and one home playoff match for the 5th place (if such match takes place) for the FIFA World Cup 2022 qualifiers provided the Licensor holds such rights. Attached hereto as **Appendix A** is a list of the seven (7) tentative matches referenced above.

(b) "**Licensed Content**": means all content provided by Licensor to ISM under this Agreement, including the Games (as such terms are defined herein).

Page 1

CONFIDENTIAL
EXECUTION VERSION

(c) **"Static Advertising"**: means fixed and/or dynamic and/or electronic signs/posters and/or LEDS located in the perimeter of the playing field in which the Team plays the Games.

(d) **"Closed Circuit Television Venue" or "CCTV"**: means an exhibition designed for viewing by a multiple-person audience in an enclosed commercial premises which is open to the public at non-residential locations, including, but not limited to, bars, clubs, lounges, restaurants, theaters and the like of a commercial (or non-commercial) nature.

(e) **"Pay-Per-View" or "PPV"**: means when exhibition is available for television viewing in private homes upon payment of a fee solely for the Game(s).

(f) **"Restricted Window"**: means the period from the beginning of the "live" Game through (48) hours following the end of the "live" exhibition of such Game, during which Licensor shall not simultaneously broadcast the Games through free to air/broadcast TV and/or cable and/or satellite/DTH and/or telco.

(g) **"Territory"**: means the United States, including its commonwealths, territories and possessions (it being acknowledged that the rights granted herein shall be non-exclusive with respect to the US Virgin Islands).

2. **LICENSES.**

**License Grants.** Licensor hereby grants to ISM the exclusive right and license to transmit, distribute, exhibit, make available and otherwise use and exploit the Games during the Restricted Window only via non-OTT, (as defined below) linear CCTV and PPV transmission (such as traditional satellite and cable (eg., via a non-broadband set top box), including linear tape delay transmission in the Territory during the Term. It is expressly acknowledged and agreed that the Licensor has already exclusively licensed to a third party all rights to exploit and transmit the Games in the Territory to residential customers by the Internet ("OTT") to any devices and by any payment mechanisms (including without limitation free, pay and pay-per-view). In addition, following the Restricted Window Period, ISM shall have the right to transmit and exhibit the Games via non-OTT media platforms, including linear tape delay transmission. For clarity, ISM rights exclude all via the internet and over the top delivery services or any other internet streaming.

Licensor reserves all other rights to distribute or allow third parties to distribute the Games in the Territory during the Term, during and following the Restricted Window Period including but not limited to; via the internet and OTT media platforms for residential customers, (including via pay-per-view), Betting Rights companies (Betting rights), DVD, CD-ROM, Blue Ray Disc recording. For the avoidance of doubt, it is acknowledged and agreed that the grant of rights hereunder excludes betting rights, which rights shall be retained by Licensor.

Licensee may, at its own expense, technologically manipulate the Licensed Content signal only in connection with the receipt and delivery of the Licensed Content, including decrypting, decoding, internal tests and quality control, re-encoding/transcoding. Licensee in any case agrees not to modify the original signals of the Games (e.g., by adding, deleting, editing or modifying the graphics, on-field advertising/Static Advertising, logos, credits, copyright contained therein), provided that nothing shall prevent Licensee from adding the logo of the channel broadcasting the Games and/or the Advertising marketed by the Licensee, and/or exercising its rights as set forth herein. Subject to the foregoing, the generation of the images must be respected, and the original scenes and/or scenarios of the play field, with its installed Static Advertising cannot be modified, nor may the scenes and/or scenarios through technological procedures (virtual advertising) or any other method.

CONFIDENTIAL
EXECUTION VERSION

A. **Highlights non exclusives.** ISM shall have the right on a non exclusive basis to create highlights, clips and/or excerpts of Licensed Content ("**Highlights non exclusives**") of a duration not higher than three (3) minutes per Game of the Championship and to use such Highlights, commercial spots, non exclusives, including without limitation insertion in programming produced by ISM. The Licensor reserves the right to exploit by itself or by assigning to third parties in a non-exclusive basis, the retransmission rights in the Territory of summaries of the Games.

3. **TERM.**

This Agreement will commence as of June 3, 2021 (the "**Effective Date**") and continue through a period of seventy-two (72) hours following the later of (a) March 29, 2022 and (b) the delivery to ISM of all Games, unless terminated earlier as provided for in this Agreement (the "**Term**").

4. **LICENSE FEES.**

ISM will pay to Licensor the total amount of ███████████ ) American dollars with respect to Games delivered to ISM in accordance with this Agreement, in the following manner:

(a) Due upon signing the amount of ( ███████ )

(b) Payment method: All payments shall be made in U.S. dollars via standard means (e.g., ACH), and shall be net of any tax or duties imposed by Licensor's jurisdiction (e.g., VAT).

(c) CCTV and PPV Payments

CCTV payments:

1. ███ by August 15, 2021
2. ███ by September 25, 2021
3. ███ by October 25, 2021
4. ███ by January 15, 2022

PPV payments:

1. ███ by September 15, 2021
2. ███ by October 15, 2021
3. ███ by November 15, 2021
4. ███ by December 15, 2021
5. ███ by February 15, 2022
6. ███ by March 15, 2022
7. ███ by April 15, 2022
8. ███ by May 15, 2022

Page 3

CONFIDENTIAL
EXECUTION VERSION

(d) Licensee agrees that it shall have set aside such amounts in either a segregated account, escrow, restricted account subject to a bank guarantee or similar financial arrangement or account in order to make sufficient funds available for payment in accordance with the terms of payments established herein.

(e) In order to secure ISM financial obligations and payments pursuant to this Agreement, ISM shall procure in favor of Licensor by no later than (30) days upon execution of this agreement an irrevocable and unconditional standby letter(s) of credit for the (█████████) balance, payable on first demand, issued by **Wells Fargo Bank** (or such other reputable bank as may be accepted by Licensor in writing in its absolute discretion) in the form as agreed to by the issuing bank set out in Appendix B to this Agreement. However, Licensor shall not unreasonably withhold its approval as long as the bank is listed on the NYSE or NASDAQ. In the event that Licensee does not provide to Licensor the issued letter of credit by the aforementioned deadline (i) Licensor shall have the right to keep the first payment, and (ii) this Agreement shall automatically lapse without further formality and be considered null and void without further liability to either Party. Licensee shall be responsible for all its own costs associated with issuance of such letter of credit. For the avoidance of doubt, the Letter of Credit shall be dated to expire on May 31, 2022. Further, the Licensee may reduce and/or replace the letter(s) or credit to address only balances as the Licensee's makes the requisite PPV and/or CCTV payments to Licensor as set forth above.

5. <u>DELIVERY</u>.

Licensor shall be responsible for the delivery to the Licensee of all the indicated Games, uploaded to a satellite (Uplink) with footprint in the Territory, in accordance with the terms set forth herein.

All the costs and/or expenses for the production and or generation of the signal, as well as the expenses of the Uplink (uploading the signal to the satellite) of the Games shall be borne by the Licensor. All downlink costs (downlink) will be borne by the Licensee.

Licensor shall deliver the Licensed Content to ISM via satellite (i.e., SES14 and BT Tower) or via another mutually agreed upon manner/method. In each case, Licensor will use standards, practices, procedures and format(s) for delivery that are generally-accepted throughout the industry, without interruption, disruption, and/or interference.

Each Game will be delivered by Licensor to ISM, in high definition format, as fully produced feeds including commentary in English and Spanish (i.e., a separate feed for each such language), and graphics (each such feed, a "**Fully Produced Feed**").

Licensee must ensure that any exploitation of the Rights licensed to them herein shall always provide for Geo-blocking to guarantee that the Games will only be exhibited in the Territory.

6. <u>ADVERTISING</u>.

ISM shall have the right to insert any and all commercial, promotional or sponsorship announcements in or around the Licensed Content ("**Advertising Time**") (including (for example) on-screen elements (e.g., "clock wrap," side of screen elements), pre- and post-Game sponsor announcements, sponsors for first or second half of Games), and to retain for itself all of the proceeds derived from the sale of such Advertising Time.

Page 4

7. **PROMOTION.**

   a. **General.** ISM shall have the right to promote, advertise and/or publicize the Games and ISM's exhibition thereof in any and all media, at its own expense. For clarity, the grant of exclusive rights hereunder shall not prohibit Licensor's use of clips from the Games for agreed marketing tactics.

   b. **Logos and distinctive signs:** ISM shall have the right to use the names, logos and distinctive signs of the Team and federations in connection with the Licensed Content and in any other manner related to the exploitation of the Licensed Content including promotional uses and information material.

   c. **Prohibitions.** The Licensee is aware that the Licensor has acquired the rights and the authorization from the owner of the rights to transmit the matches of the qualifiers of the World Cup of Catar 2022, subject of this contract.

   The aforementioned right includes only the transmission of the images of the Match in whole or in part for a limited time, being lawful and in accordance with the market custom, the production of promotions using said images to encourage viewers to view the transmissions through any type of device or means.

   These promotions may use part of the footage of the original broadcasts, through the resources provided by editing, without emphasizing, deliberately and predominantly in the individualized image of the players participating in the playoffs. The promotion must refer to the Games and the teams and not to the players participating in them.

   Neither the national federations nor the Licensor have rights over the names or over the images of the players participating in the playoffs, thus, neither of them may validly license their use.

   For this reason, Licensee may only use the names and the images of the players participating in the qualifiers to advertise the Games if three (3) or more players are included; however, it may use the images of the already played Matches, even using the individual image of a player in action within the footage (i.e. the scene of a goal, the saving of a penalty, the overflow, dribbling, etc.) to make the advertising more attractive.

   In no case the Teams or their brands, or the federations and their brands may be associated with a sponsor or advertiser of the transmissions.

8. **TERMINATION.**

Either party may terminate this Agreement:

(a) immediately upon written notice to the other party if the other party files a petition for bankruptcy, becomes insolvent, or makes an assignment for the benefit of its creditors, or a receiver is appointed for the other party or its business; or
(b) with 30 days' prior written notice for any material breach, if such breach is not cured within the foregoing notice period; or

(c) in whole or in part, in respect with any Match, territory or means in respect of which, and solely if, the contract under which the Licensor has obtained the rights that are subject to this Agreement is terminated or suspended by the football federation, subject to the following Section (Cancellation Not Attributable to the Parties).

Licensor may in its sole discretion decide to terminate this Agreement if ISM fails to provide the bank guarantee set forth in Section 4, (e) within 45 days upon execution of this Agreement.

9. **CANCELLATION NOT ATTRIBUTABLE TO THE PARTIES.**

In the event that any of the Games or the underlying rights to the Games are cancelled or are not possible to market due to events of Force Majeure and/or factual constraints from the football federation of the country where the Game is going to be played, and/or the loss of the rights of the Licensor, ISM shall be entitled to take Fees paid with respect to any such Game as a credit against Fees not yet paid, or Licensor shall upon demand refund such Fees paid to ISM. Subject to the foregoing, if such facts are not attributable to the parties, Licensor and Licensee hereby agree to renegotiate in good faith the relevant terms of this agreement (such as rescheduling of Games, Term).

10. **REPRESENTATIONS AND WARRANTIES.**

   a. **General.** Each party represents and warrants that (a) it has full power and authority to enter into the Agreement and perform all of its obligations hereunder, (b) upon execution and delivery hereof, this Agreement will constitute the valid and binding obligations of the party, and (c) it is under no contractual or other legal obligation that is likely to interfere with its performance of this Agreement.

   b. **Licensed Content.** Licensor represents and warrants that the Licensed Content, and ISM's authorized use thereof and exercise of its rights herein, will not (a) contain any material that is defamatory, libelous, slanderous, indecent, or obscene, (b) infringe on any third-party right, including rights arising from contracts between Licensor and third parties, copyright, trademark, trade secret, moral rights, privacy rights, rights of publicity, or any other intellectual property or proprietary rights, or (c) violate any applicable laws, rules or regulations. Licensor further represents and warrants that (i) it has complied, and will comply, with all applicable laws, rules and regulations in acquiring rights to the Licensed Content and Marks and in licensing the rights granted hereunder, (ii) it has acquired all necessary licenses, clearances, releases or permissions with respect to the Games and all material contained therein and for ISM's use thereof as set forth herein, and (iii) there are no actions, suits or proceedings pending or threatened against Licensor which may affect Licensor's ability to perform its obligations hereunder.

   c. **Copyright Enforcement.** Licensor will use best efforts to discover, and to pursue and enforce against any unauthorized use, distribution or exhibition of the Games in the Territory. Notwithstanding the foregoing, ISM shall have the right (but not the obligation) to take any action to enforce the rights granted to it hereunder and/or to institute a claim for infringement within the Territory, and to retain any proceeds therefrom.

   d. In an effort to protect the Commercial Rights and/or non-residential rights in the Event(s) granted to ISM, ISM will coordinate and finance its own piracy program. Insofar as Licensor is concerned, ISM shall have the right and standing, as exclusive assignee, to assert independent claims, solely in the name of

ISM, for copyright infringement under the copyrights laws of the United States and violations of the Federal Communications Act, in either case solely relating to the unauthorized exploitation of the Commercial Rights and/or non-residential rights in the Event(s) in the Territory. ISM agrees to notify Licensor promptly in the event any issue is raised relating to the validity of Licensors ownership of the Event.

11. **INDEMNITIES.**

    a. **General.** Each party will indemnify and defend the other party from and against any and all claims, demands, causes of action, debt or liability, including reasonable attorneys' fees ("**Losses**") incurred in connection with any third-party claim based upon or arising out of such party's breach of this Agreement.

    b. **Procedure.** The party entitled to indemnification hereunder (an "**Indemnified Party**") shall promptly notify the other party (the "**Indemnifying Party**") in writing after receipt of notice of the commencement of any claim or action for which a claim for indemnification may be made hereunder; provided, that the failure to provide such notice will not relieve the Indemnifying Party from any indemnification obligation under this Section except to the extent of any material prejudice to the Indemnifying Party resulting from such failure. The Indemnifying Party shall have primary control of the defense of the claims and negotiation for its settlement, except that (A) the Indemnified Party may, at its own cost and expense, obtain separate counsel to represent its interest, (B) the Indemnifying Party may enter into a settlement of a third party claim or action if such settlement (i) involves only the payment of money damages by the Indemnifying Party, and (ii) includes a complete release of the Indemnified Party's indemnitees, it being acknowledged and agreed that any other settlement shall be subject to the written consent of the Indemnified Party's indemnitees, and (C) the right to control the defense of the claims may be subject to requirements of the Indemnifying Party's insurance policies (e.g., participation by certain counsel).

12. **LIMITATION OF LIABILITY.**

Neither party hereto will be liable to the other for indirect, incidental, consequential, liquidated, special, punitive or exemplary damages or penalties including losses of business, revenue or anticipated profits, except for liabilities arising from any obligations related to indemnification or for any breach of the confidentiality provisions set forth herein. The limitations of liability described in this section will apply, whether or not the parties were or should have been aware or advised of the possibility of such damage, and regardless of whether any remedy fails of its essential purpose.

13. **GENERAL.**

    a. **Confidentiality.** The terms and conditions, other than the existence and duration, of this Agreement, and any confidential or proprietary information disclosed by either party to the other under this Agreement, shall be kept confidential by the parties and shall not be disclosed by either party to any third party except: (i) as may be required by law (in such event, the disclosing party shall notify the other party as soon as practicable in order to afford such other party an opportunity to seek a protective order); (ii) as part of the normal reporting or review procedure (A) to such party's accountants, auditors, agents, and legal counsel, or (B) for valid bona fide business purposes, to prospective lenders or investors, and employees of partners and parent and subsidiary companies, provided that any such

person and/or entity has agreed in writing to be bound by confidentiality obligations or are otherwise bound by obligations of confidentiality (e.g., attorney-client) and (iii) to enforce its rights under this Agreement.

b. **Publicity.** Neither party may make any public statement regarding this Agreement without the other's prior written approval; provided however that ISM shall have the right to issue press releases and to publicize the Licensed Content and its distribution, but will not disclose the economic terms hereof.

c. **Notices.** All notices given under this Agreement shall be in writing and be given by email (which receipt shall be deemed to have been given upon receipt of a return email acknowledging receipt, with an automatic "read receipt" not constituting acknowledgment), or by any of the following means: post (which receipt shall be deemed to have been given seven (7) days after the date of mailing, postage prepaid), personal delivery (which receipt shall be deemed to have been given upon delivery), or overnight courier (which receipt shall be deemed to have been given on the date of delivery by the overnight courier), to the address specified below. Each party may change its address for notices by providing written notice to the other party.

If to Licensor, to the address in the preamble of this agreement, Attn: Jorge Martinez jmartine@caracoltv.com.co; Gonzalo Guerra gaguerra@caracoltv.com.co.

If to ISM, to the address in the preamble of this Agreement, Attn: Head of Content Strategy & Acquisition (email: Doug@Integratedsportsnet.com).

d. **Assignment.** Neither party shall assign this Agreement, in whole or in part, without the prior written consent of the other party; provided that such consent shall not be required in connection with any assignment to (A) any person or entity (i) that controls, is controlled by or is under common control with the assigning party, or (ii) that purchases all or substantially all of the assets of the assigning party or (B) a successor entity resulting from a merger, acquisition or consolidation. Except as otherwise provided herein, no person or entity shall be a third-party beneficiary hereto.

e. **No Waiver.** Except as expressly described in this Agreement, neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under this Agreement.

f. **Severability.** If any term (or part of a term) of this Agreement is invalid, illegal or unenforceable, the rest of the Agreement will continue in force unaffected.

g. **Governing Law; Venue.** This Agreement is governed by New York law (without giving effect to the laws, rules or principles of the State of New York regarding conflicts of laws). All claims arising out of or relating to this Agreement will be litigated exclusively in the federal or state courts of the City of New York, New York and the parties consent to personal jurisdiction in those courts.

h. **Amendments.** Any amendment must be in writing and expressly state that it is amending this Agreement.

i. **Counterparts.** The parties may execute this Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

Page 8

CONFIDENTIAL
EXECUTION VERSION

j. **Entire Agreement.** This Agreement sets out all terms agreed between the parties and supersedes all previous or contemporaneous agreements between the parties relating to its subject matter.

## 14. PANDEMIC.

Taking into account that the World Health Organization ("WHO") has characterized the coronavirus as "pandemic" due to the alarming rates of propagation of such virus and its severity, and in anticipation that this may have a temporary incidence of indeterminate duration in the relationship that both parties maintain, until the pandemic is controlled both parties agree to work in good faith to accommodate Game rescheduling as such circumstances may require.

## 15. CONFLICT OF INTEREST.

The Parties agree that any controversy and/or claim arising out of or related to this Agreement shall be submitted exclusively to the Sports Arbitral Tribunal (TAS – Tribunal Arbitral du Sport/CAS – Cour of Arbitration Sport) located in Lausana, Switzerland and solved definitely pursuant to the Code of Sports-related Arbitration (Code de l'arbitrage en matière de sport/Code of Sports – related Arbitration) accepting as applicable law the swiss legislation, and Spanish will be the language of the arbitration.

The Panel shall be composed by three (3) arbitrators. Each Party shall choose one arbitrator of the List TAS/CAS and those two arbitrators shall choose through mutual agreement the President of the Panel within a term of 15 days.

If within the aforementioned term there is no agreement on who shall be the President, the President of the division shall appoint the President of the Panel. In the event that any of the Parties does not choose its arbitrator in the term foreseen in the Code of Sports-related Arbitration, the president of the division shall be the one in charge of doing it.

In witness whereof the foregoing is agreed, the parties execute this agreement as a sign of acceptance.

LICENSOR,

By: _____
CARACOL TELEVISIÓN S.A.
Jorge Martinez de León

LICENSEE,

By: _____
INNOVATIVE SPORTS MANAGEMENT, INC.
Doug Jacobs

Page 9

CONFIDENTIAL
EXECUTION VERSION

## Appendix A

June 2021
8- Colombia Vs Argentina

September 2021
10- Colombia Vs Chile

October 2021
12- Colombia Vs Ecuador

November 2021
14- Colombia Vs Paraguay

January 2022
15- Colombia Vs Peru

March 2022
17- Colombia Vs Bolivia

Pending Schedule
5- Colombia Vs Brazil

\* All the dates and times of the matches are subject to CONMEBOL stipulations and may be re-scheduled at its sole discretion.